FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   JUL 1 4 2014   ★

LONG ISLAND OFFIC:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
LOUISE DEMARCO,

                              Plaintiff,

                - against-

BEN KRUPINSKI GENERAL CONTRACTOR,
INC. and BEN KRUPINSKI, individually,

                              Defendants.
-----------------------------------------------------------X

**OPINION AND ORDER**
**12-CV-0573 (SJF)(ARL)**

FEUERSTEIN, J.

On February 7, 2012, plaintiff Louise DeMarco ("plaintiff") commenced this employment

discrimination action against defendants Ben Krupinski General Contractor, Inc. ("BKGC") and

Ben Krupinski ("Krupinski"), individually, alleging, *inter alia*, discrimination based upon her

disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et*

*seq.*, and the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law §§ 296, *et seq.*,

and violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* On

September 18, 2013, following a bifurcated jury trial on the issue of liability, the jury returned a

verdict finding: (1) that plaintiff proved by a preponderance of the evidence that her employment

was terminated by defendants; and (2) that plaintiff did not prove by a preponderance of the

evidence that defendants acted with malice or reckless indifference to her federally protected rights.

On September 23, 2013, following a one (1)-day jury trial before the same jury on the issue of

damages, the jury returned a verdict: (1) awarding plaintiff damages in the total amount of seven

thousand eight hundred forty dollars ($7,840.00) to compensate her for a net loss of wages and

benefits to the trial date; and (2) declining to award plaintiff damages to compensate her (a) for

future loss of earnings for the period from the date of trial until the date when she would have

1

voluntarily resigned or obtained other employment or (b) for emotional pain and mental anguish.

Judgment was entered upon the jury verdict on September 30, 2013. Pending before the Court is

plaintiff's motion for a new trial on the issue of damages pursuant to Rule 59(a) of the Federal

Rules of Civil Procedure. For the reasons set forth below, plaintiff's motion is denied.

I.       The Bifurcated Jury Trial

     A.       The Liability Trial

On September 17, 2013, plaintiff testified to the following during the trial on the issue of

liability[1]:

       1.       Direct Examination

Plaintiff was employed by BKGC as a receptionist from August 2006 to March 2011. (LT.

29)[2]. In October 2010, plaintiff was diagnosed with uterine papillary serous carcinoma, a form of

uterine cancer. (LT. 34). Plaintiff testified that "[a]s soon as [she] found out [she] alerted

[Hupalowski] to the fact that [she] would be eventually having surgery [a radical hysterectomy],

and [she] would probably be out for a few weeks." (LT. 34-35). Plaintiff had the surgery in "the

early part of November" 2010, (LT. 35), and was out until the end of December 2010. (LT. 35).

Defendants paid plaintiff her salary during that leave of absence. (LT. 35).

Plaintiff returned to work at BKGC on or about January 3, 2011. (LT. 37). Upon returning

---

[1] Although Christina Hupalowki ("Hupalowski"), plaintiff's supervisor at BKGC, and
Krupinski also testified during the trial on the issue of liability, their testimony is irrelevant to the
instant motion.

[2] "(LT.)" refers to the transcript of plaintiff's testimony during the liability trial on
September 17, 2013, annexed to the Affirmation of Costantino Fragale, dated October 23, 2013
("Fragale Aff."), as Exhibit J.

to work, plaintiff discussed with Hupalowski her need to have approximately seventeen (17) chemotherapy treatments beginning around the end of January 2011 and requested to have Thursdays off once the treatments started.[3] (LT. 38-39).

Plaintiff's chemotherapy treatments started the third week of January and she occasionally called in sick on the Fridays following the treatments because the anti-nausea medication that she was given with the treatments caused her "severe intestinal problems." (LT. 40). According to plaintiff, Hupalowski "reiterated several times that Mr. Krupinski was not happy with [her] taking off on Friday." (LT. 41-42).

On Thursday, March 17, 2011, plaintiff had a chemotherapy treatment and she called in sick to work on that Friday, March 18, 2011. (LT. 43). On the morning of Monday, March 21, 2011, plaintiff again called Hupalowski and told her that she could not come to work because she "was very, very sick" and that she "was sorry about that." (LT. 43). Plaintiff also testified as follows:

> "I told her I was feeling terrible. I said to her specifically, I said, at this point, I says [sic], I can't take this anymore. I says [sic], the medication is really reeking [sic] havoc on me personally and it's also affecting me being able to go to work.
>
> I said I need to speak to Dr. Straus and discuss this with him because I was sure it was the [anti-nausea medication] and the Benadryl which would also exhaust me.
>
> At that point, Ms. Hupalowski brought up the point about filing for disability or unemployment benefits, she's the one that brought it up and I had said to her, I said, thank you. She said [Krupinski] would help me with any written documentation I would need. I said thank

---

[3] Following all of the testimony at the trial on the issue of liability, the parties stipulated that "if [plaintiff's] physician came to testify, he would have said that his treatments were only given on Thursdays and that she did inquire about having them on Fridays, as would his office assistant." (LT. 184).

you, but let me talk to my doctor first because I do believe that this is the antinausea [sic] medication. I said once I speak to him, I said I'll get back to you. I said don't say anything to [Krupinski], because I was embarrassed about the problem."

(LT. 44). When asked why she was embarrassed, plaintiff testified:

"The [anti-nausea medication] causes severe intestinal problems.

It causes constipation and I had called up – I was almost admitted into the hospital for it because it was going on for four or five days and I spoke to my surgeon, Dr. Ortiz, about it and I spoke to Dr. Straus about it.

And that was basically why I didn't want Mr. Krupinski to know and [Hupalowski] knew that, and I didn't want anybody else in the office to know. It's an embarrassing situation, and that's the only reason I said don't say anything to Mr. Krupinski until I speak to my doctor."

(LT. 45).

Plaintiff discussed her intestinal problem with her doctor on Thursday, March 24, 2011, at which time he switched the anti-nausea medication and may have also taken her off the Benadryl. (LT. 46-47). On Friday, March 25, 2011, plaintiff called Hupalowski and told her that she had seen her doctor, who changed the anti-nausea medication; that she was "feeling terrific;" that she felt "really well to come back to work on Monday, and just start my job all over again;" and that she did not "even think [she] would even need to take off a full day on Thursday, or probably even Fridays." (T. 48). According to plaintiff, Hupalowski responded: "Sorry. [Krupinski] had found – he had put an ad, classified ad in the paper, and he had two candidates that were going to take [plaintiff's] position." (LT. 47). Plaintiff further testified that Hupalowski told her that Krupinski "had moved on" and "didn't want [her] there anymore at that desk part time." (LT. 48-49). Plaintiff then testified as follows:

4

"I was shocked.

> I was devastated. I told her, how could he do that? I was feeling
> much better. I begged – I begged her. I begged her if I could talk to
> [Krupinski] and she said he would not be in the office that day, that
> he will probably be in on Monday, that's what she had said. She
> said he would be in on Monday.

> And she would talk to him then, and she said to wait until then."

(LT. 49).

Plaintiff testified that on Saturday, March 26, 2011, Hupalowski called her at home and,

> "just reiterated it again, that she was sorry. [Krupinski] didn't want
> [her] there.

> The desk had to be manned at all times. It had to be full time. He
> didn't want me there part time, and that was it, and I was very upset.
> I started to cry at that time."

(LT. 49-50).

Although plaintiff testified that she "was fired" as of March 26, 2011, BKGC continued to

pay her salary for four (4) to five (5) weeks thereafter. (LT. 52). Plaintiff never discussed with

Hupalowski why defendants continued to pay her after she was terminated and did not know why

they did so. (LT. 52-53). After defendants stopped paying plaintiff's salary, in June 2011, she

applied for unemployment compensation. (LT. 53). According to plaintiff, her application was

initially denied because defendants had objected to it claiming "that [she] wasn't terminated, that

[she] had quit." (LT. 53). After plaintiff explained to the representative at the unemployment

office what had happened, the representative told her that she would discuss the situation with her

supervisor. (LT. 53). Plaintiff ultimately received unemployment compensation in the amount of

four hundred five dollars ($405.00) a week for eighteen (18) months. (LT. 54).

Plaintiff testified that at the time that her employment was terminated on March 26, 2011,

5

she was about "halfway through [her] treatments." (LT. 42, 52). Plaintiff completed her chemotherapy treatments at the end of July or beginning of August 2011. (LT. 52).

### 2. Cross-Examination

Between the time that she was diagnosed with cancer and the time of her surgery, plaintiff "had taken off a couple days here and there because [she] had to go for pre-op testing and [she] had to see [her] surgeon, Dr. Ortiz." (LT. 62). In addition, plaintiff took off from work for "additional testing" during the first week of November. (LT. 62).

Plaintiff testified that defendants mailed her paychecks to her during the time that she was out between November 2010 and January 2011. (LT. 68-69). When asked if she was "paid for full-time work for January, February and March," plaintiff responded: "As I had said I wasn't sure. There may have been a day or two I wasn't paid, but I wasn't a hundred percent sure." (LT. 70). However, when she was again asked if she had been paid full time wages from January to March, "despite [her] intermittent absences," plaintiff responded, "yes." (LT. 77). In addition, plaintiff testified that defendants never refused any request by her for a day off. (LT. 82). The following colloquy then ensued:

> Q. And basically any day that you needed off, it was off and fully paid?
>
> A. As I said, I dealt with [Hupalowski] and she said she always got final approval from Mr. Krupinski. But I never spoke to him directly about it.
>
> Q. So between November 2010 and March of 2011, basically you got a full paycheck every week?
>
> A. Yes.

(LT. 82).

It wasn't until about the fourth chemotherapy treatment that plaintiff "started getting severe intestinal problems." (LT. 67). Except for the planned chemotherapy treatments on Thursdays, for which she arranged ahead of time to have the day off, plaintiff's absences on Fridays and "a couple of" Mondays were called in on days she was scheduled to work. (LT. 71-72).

Plaintiff was out the entire week beginning March 7, 2011 because she "had the flu," (LT. 72-73), and had called in "every other day" that week to tell Hupalowski she was "not feeling well and [she] was sick." (LT. 73). Plaintiff worked three (3) days the following week because she had a treatment on Thursday, March 17, 2011 and immediately "became violently ill[.]" (LT. 73). Plaintiff did not go to work at all during the week beginning March 21, 2011. (LT. 84-85).

When defense counsel asked plaintiff why she did not go to work on March 25, 2011 when she was "feeling great," plaintiff responded:

> "Because I told [Hupalowski] that I was feeling much better and that
> I – I was still weak, I still wasn't feeling – I was still feeling sick
> from the condition that I had, the severe constipation that I had.
>
> But I didn't have that horrible feeling that I was getting from the
> antinausea [sic] medication. So Friday I was still weak and I had
> said I'll be back Monday, full force, work. I said I'm feeling
> terrific."

(LT. 74-75). According to plaintiff, she "was feeling great, compared to what [she] was feeling two or three days before it was like a [miracle][,]" (LT. 75), but she did not go to work. (LT. 75). Plaintiff further testified that after she had the anti-nausea medication changed, "all [she] had left was the nine treatments, that would have been nine days that [she] would have been out[] * * * [and] [she] would have been there full time from that point on, from March [28th] on." (LT. 86-87).

Prior to being diagnosed with cancer in October 2011, defendants allowed plaintiff only

7

five (5) sick days a year. (LT. 93).

### 3. The Verdict

At the close of all evidence, the Court dismissed plaintiff's FMLA claim, finding "that the plaintiff ha[d] failed to establish that, as is their burden, that the defendant was a covered employer, much less whether this was a covered employee * * *." (LT. 186-87). On September 18, 2013, the jury returned a verdict on the issue of liability finding: (1) that plaintiff had proven by a preponderance of the evidence that her employment was terminated by defendants, and (2) that plaintiff had not proven by a preponderance of the evidence that defendants acted with malice or reckless indifference to her federally protected rights.[4]

### B. The Damages Trial

Plaintiff was the only witness who testified at the trial on the issue of damages that was

---

[4] Plaintiff's proposed jury verdict form contained only five (5) questions on the issue of liability. The first question submitted by plaintiff, i.e., "Has plaintiff proven by a preponderance of the evidence that she suffered from a disability at all times relevant herein when she was employed with Defendants?," (Doc. No. 19, Ex. 1), was not submitted to the jury because, *inter alia*, the parties stipulated in their joint pretrial order that "[d]uring the time in question, Plaintiff was disabled within the meaning of the * * * [ADA and the NYHRL] * * *." (Doc. No 22, ¶ 7). The second question on plaintiff's proposed verdict form was submitted to the jury almost *verbatim*, except for a grammatical correction (plaintiff was not terminated by defendants; her employment was). (Doc. No. 19, Ex. 1). The third question on plaintiff's proposed verdict form, which included a citation to Kolstad v. American Dental Association, 527 U.S. 526, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999), was rephrased to conform to the specific language used by the Supreme Court in that case and, as rephrased, was submitted to the jury as the second question on the verdict form. The remaining two (2) questions on plaintiff's proposed verdict form were not submitted to the jury because they related to the FMLA claim that was dismissed by the Court. Defendants did not submit a proposed jury verdict form or object to either the plaintiff's proposed jury verdict form or the actual verdict form submitted to the jury.

held before the same jury that decided the issue of liability.

### 1. Direct Examination

On direct examination, plaintiff testified as follows:

Plaintiff was first hired by BKGC at "the end of August of 2006." (DT. 7)[5].

On Friday, March 25, 2011, plaintiff called Hupalowski and told her that she "wanted to come back to work on Monday." (DT. 8). Hupalowski "then proceeded to tell [plaintiff] that again [Krupinski] had put an ad in the classified and he had two candidates that he was thinking about. She said sorry, but they moved on * * *." (DT. 8). According to plaintiff, she "was shocked" and "very upset," (DT. 8), and she "begged" Hupalowski "to let [her] talk to [Krupinski] and explain what was going on." (DT. 8). Hupalowski told plaintiff that Krupinski "was not there," "would not be back that day" and "would probably be back in on Monday," (DT. 8), and that "[s]he'll speak to him then[.]" (DT. 8). However, Hupalowski called plaintiff "the following day, which was Saturday, the 26[th]" and said, "I'm sorry. But [Krupinski's] moved on. He doesn't want you there." (DT. 8). According to plaintiff, "[t]hat's when [she] knew it was over, that [Hupalowski] had said to [her] that [Krupinski] didn't want [her] there as part time at that desk." (DT. 8-9).

At the time that her employment was terminated, plaintiff was sixty-eight (68) years old, (DT. 25), and earned a salary of twenty-four dollars and fifty cents ($24.50) an hour, or "almost $51,000 a year." (DT. 9). Plaintiff's "only other source [of income] was [her] social security, which was just under a thousand, and [her] – and a pension from Chadbourne, which was $396 a

---

[5] "(DT.)" refers to the transcript of the damages trial on September 23, 2013. (Fragale Aff., Ex. C).

month."[6] (DT. 9). According to plaintiff, she would have continued to receive the pension and social security benefits even had she stayed employed by defendants. (DT. 22).

"[T]owards the end of June 2011," plaintiff began receiving unemployment benefits in the amount of four hundred five dollars ($405.00) a week. (DT. 9). Plaintiff received the unemployment benefits for a period of eighteen (18) months or seventy-eight (78) weeks. (DT. 9, 22).

Plaintiff's 2009 tax return indicates that for that year, her total earnings at BKGC was fifty-one thousand seven hundred forty-four dollars ($51,744.00) and she received social security benefits in the amount of three thousand three hundred forty-two dollars ($3,342.00). (DT. 13; Fragale Aff., Ex. G).

Plaintiff's 2010 W-2 and tax return indicate that for that year, her total earnings at BKGC was fifty thousand nine hundred sixty dollars ($50,960.00) and she received social security benefits in the total amount of eleven thousand three hundred sixty-three dollars ($11,363.00) and pension benefits from C&P in the total amount of one thousand one hundred eighty-eight dollars ($1,188.00). (DT. 15-17; Fragale Aff., Exs. F and G).

Plaintiff's 2011 tax return and W-2 indicate that for that year, her total earnings at BKGC from January to the end of April 2011[7] was sixteen thousand six hundred sixty dollars ($16,660.00) and she received unemployment compensation in the total amount of eleven thousand three hundred forty dollars ($11,340.00) and pension benefits from C&P in the total amount of four

---

[6] Prior to working for BKGC, plaintiff was employed as a store manager in Manhattan for "about ten years." (LT. 30). Before that job, plaintiff worked for Chadbourne and Park ("C&P"), a law firm in New York, for "almost five years." (LT. 31).

[7] Although plaintiff's employment was terminated on March 25, 2011, she continued to receive payments from Krupinski until the end of April 2011. (DT. 18-19).

thousand eight hundred seventy dollars ($4,870.00). (DT. 19-20; Fragale Aff., Exs. F and G).

Plaintiff's 2012 tax return indicates that for that year, plaintiff did not earn any wages and received unemployment compensation in the total amount of twenty thousand two hundred fifty dollars ($20,250.00) and pension benefits from C&P in the total amount of four thousand seven hundred fifty-two dollars ($4,752.00). (DT. 21-22; Fragale Aff., Ex. G). When asked if she was "ever gainfully employed" during 2012, plaintiff responded, "No. I had been looking for quite a while, but nothing had been offered to me." (DT. 21).

Plaintiff testified that she started looking for other employment, both full time and part-time, "from 2011 up until * * * just a couple of weeks [prior to the trial]," (DT. 23), and attended "about six or seven" interviews, including one at Southampton Hospital; one at a swimming pool installation and maintenance company whose name she could not recall; and one at Home Sweet Home ("HSH"). (DT. 23). Plaintiff further testified:

> "I spoke directly * * * with the owner [of HSH]. He came out specifically to interview me because when he looked at my résumé and saw that I worked for Ben Krupinski and he had said to me at that time, he said he never interviews * * * the candidates but because of my résumé stating that I worked for Ben Krupinski, he came out specifically to interview me.
>
> It went on for about 15, 20 minutes and at the end of that interview he said, I know [Krupinski]. He said, let me make a couple calls and he says I'll get back to you. He said he really liked me. I never heard back from him.
>
> The other interview – there were a few more, but the ones that stand out to me was Douglas Elliman which is a real estate company in East Hampton. I interviewed with Barbara Matsen, I believe is the last name, on a Friday at a quarter to 5. It was a late interview. She liked me a lot.
>
> She wanted to know why I had left Krupinski. I told her it was personal. She said she understood. Then she said to me I was the only one, only candidate that was qualified because most of the

11

candidates that they were interviewing they all worked for restaurants, so a quarter to 5 she said thank you. She says I'll let you know first thing on Monday. She said I'll make a couple of phone calls just like Ken from [HSH] had said.

And the next morning I believe you have the e-mail, she sent me an e-mail a quarter to 9 that morning saying sorry. We hired somebody else, and there were other interviews that I had done."

(DT. 23-24). No offers of employment were ever extended to plaintiff. (DT. 24). Plaintiff's counsel admitted into evidence, *inter alia*: (1) a handwritten "personal list" created by plaintiff "just before" her deposition on August 27, 2012, regarding "the classified ads in the papers in the local papers and online at positions that [she] applied for," (DT. 26-27; Fragale Ex. H)[8]; and (2) various documents indicating "all the positions that [plaintiff] applied for * * * maybe 40, 50 positions, positions that [she] faxed, résumés that [she] may have left, went to the office, they weren't taking interviews there, but you would drop off a résumé there, or people that [she] called. And * * * e-mails that [she] sent out, confirmation," (DT. 29; Fragale Ex. H)[9].

---

[8] The list indicates that plaintiff did not seek employment until September 2011, more than five (5) months after her employment had been terminated by defendants; that plaintiff emailed her résumé to one company for an executive assistant position on September 14, 2011; that plaintiff faxed a woman for a medical receptionist position on September 21, 2011; that plaintiff called someone for an unidentified reason on October 26, 2011; and that plaintiff emailed someone for a secretary position on November 2, 2011. (Fragale Aff., Ex. H).

[9] The documents include, *inter alia*, copies of parts of classified ads from local newspapers in East Hampton; information from the New York State Department of Labor's Workforce New York One Stop Career Center resource room, including a list of internet job search resources; five (5) facsimile transmittal sheets from plaintiff to various companies from early January 2013 to early May 2013 seeking employment and indicating that her résumé was attached, but containing no confirmation that the facsimiles had been sent; twenty-five (25) emails plaintiff sent to various companies from January through early May 2013 seeking employment and indicating that a copy of her résumé was attached; three (3) other emails plaintiff wrote to a tech optometry office, an ob/gyn office and the Bay Street Theatre, indicating that a copy of her résumé was attached, but containing only handwritten dates of "3/25/13," "1/23/13," and "5/3/13," respectively, and no indication that they had been sent; two (2) letters

12

Plaintiff also checked "online postings for jobs" and testified that "[t]here are a few job sites that [she] still go[es] to. There's SMT and workforce dot com, job dot com. There's a few others." (DT. 32). Plaintiff estimated that she made "[a]t least a hundred, maybe more" job applications since the day she was terminated. (DT. 32). According to plaintiff, she "applied for all sorts of different types of [positions] working in doctors' offices, a vet, * * * just about everything, part time and full time, and a lower hourly rate than when [she] was working in Mr. Krupinski's office." (DT. 33). Plaintiff never "decline[d] to apply to a job that paid less than $51,000 a year[.]" (DT. 33).

When asked how long she expected to work at BKGC had she not been terminated, plaintiff responded:

> "I'm 70, but I'm energetic. I mean, I live home. I'm alone. I do plumbing. I paint. I fix things. I would have worked as long as I could, five, six, seven, ten years. [Krupinski] has somebody there I believe now that works well into his 70s.
>
> It was why not? It's so convenient for me and I needed that, besides that, besides wanting to work, liking where I worked, I needed it financially too."

(DT. 25).

When asked if she thought that she would "be able to find comparable employment like the

---

from plaintiff to Sag Harbor Veterinary Clinic and the Quogue Union Free School District, dated February 7, 2013 and March 27, 2013, respectively, seeking employment and indicating that a copy of her résumé was enclosed, but containing no confirmation that they had been mailed; emails between plaintiff and Ursula Lindgren, of Proper Ph Pools, between March 22, 2013 and March 25, 2013 regarding an office help position, for which an interview was set for March 27, 2013; a photocopy of a classified ad for "Doctor's Office" with a handwritten date of May 3, 2013 and notation, "Spoke w/ Dr. John Kavanaugh (interview 5/6/13 @ 3:50)" (telephone number omitted); and an email plaintiff sent to Barbara Mattson at Douglas Elliman on January 5, 2013 indicating, "I am disappointed, but I hope it all works out. Thank you again for taking the time to meet with me. If there is any change in the circumstances or something comes up in the future please do not hesitate to contact me."

position [she] held at [BKGC]," (DT. 32), plaintiff responded:

> "Probably not.
>
> I mean, I'm 70 years old. I haven't found anything up to this point. The job market is terrible. I think everybody knows that.
>
> Being my age, no one wants to hire you, I mean, there's bias. No. I probably – not what I was doing and never at the salary I was making."

(DT. 32-33). When asked if she would continue to look for work, plaintiff responded:

> "Of course, of course.
>
> I love to work. I really enjoy working. You get out. You meet people, which is why I loved working at Krupinski. I had no intention of not working.
>
> Besides that, I need money. There's no way I could live on my social security and my pension."

(T. 37).

Plaintiff experienced financial hardship as a result of her termination, (T. 33), and testified:

> "It's embarrassing. I'm unable to pay my bills, credit card bills, fuel, all of that, my mortgage.
>
> I was just sent a letter just recently that they are going to begin foreclosure proceedings. When I was terminated from Mr. Krupinski's office I started paying the interest, not the principle, and I kept up with that as long as I could, but at some point that was it. I couldn't even pay the interest anymore."

(DT. 33-34). Plaintiff further testified that she started defaulting upon the payment of interest on

her mortgage "probably, easily nine months to a year" prior to trial and that she received a letter

from Capital One ("the Capital One letter"), the mortgage holder, "stating that they were notifying

this law firm to begin foreclosure proceedings against [her]." (DT. 34). The Capital One letter,

dated May 17, 2013, was admitted into evidence. (DT. 35; Fragale Aff., Ex. I).

When asked how her termination and the Capital One letter "affected [her] emotionally,"

14

plaintiff responded:

> "It's like anything, you know, in particular, I mean, I never in all the years – I had my mortgage 16 years, I was never ever late, not once, I never missed a payment, ever. This is a first.
>
> You get depressed. I mean, you get scared. What do you do? What do you do for money? I mean, what do you do? You need a job in order to survive, and I have been trying to do that.
>
> You wake up and this happened quite a bit in the beginning, it happens now because of this, but you wake up in the middle of the night and, you know, you realize, I lost my job. I don't have any money. So you have to cut back on everything. You cut back on your electric, your fuel, food, you cut back on everything.
>
> I have gotten notices that they would shut it off unless it was paid. That is one of the reasons that, you know, I'm in the position that I'm in."

(DT. 36-37). Plaintiff further testified that she lives by herself and supports herself. (DT. 37).

When asked if she ever sought treatment by any doctor for her depression, plaintiff responded:

> "No, no.
>
> It's just that, you know, you go into that little hole, you know, you go into that little hole every so often and you feel sorry for yourself and then you come out of it and you try to do what you need to do to help yourself."

(DT. 37).

### 2. Cross-Examination

On cross-examination, defense counsel questioned plaintiff about her testimony during her deposition on August 27, 2012 and the following colloquy ensued:

> Q.  Ms. DeMarco, do you recall that August 27th, 2012, was the date of the deposition?
>
> A.  I remember the deposition, yes.

15

Q.     At that time do you recall that you were asked questions
       about job searching?

A.     Yes.

* * *

Q.     If I was to say to you at that point in time your answer was I
       faxed a few things, no interviews, no calls, does that seem
       accurate?

A.     Yes.

Q.     When I asked you specifically who you had faxed things to
       at that point in time, you said that you didn't have any
       memory of where you had faxed them.

A.     Because I didn't have the documents in front of me. So I
       couldn't remember.

Q.     So it's your testimony that you couldn't remember but at
       some point you created this document.

A.     Because I had a myriad of notes and of positions that I had
       applied for or called.

       I think it was mostly calling because the economy
       was so bad there was really nothing that I was
       qualified for, so at that point as you will notice in
       2011 there wasn't that much that was in the
       newspapers.

       It was really – they were few and far in between and
       I wasn't qualified for bookkeeping or any of the
       other positions that were in the papers at that time.

Q.     Well, it says on this listing on March 7th, you e-mailed
       somebody named Linda about a legal assistant position.

       You were qualified for that job, right?

A.     I don't remember that.

       Do you have – which one is that?

16

* * *

A.     I applied, I e-mailed her, and nothing came back, no response.

Q.     During your deposition, you didn't make that notation, did you, you didn't say that?

A.     Because I didn't have the document as I had it organized in front of me as you just showed it to me now.

Q.     But the question was asked, had you applied for any jobs.

I mean, you didn't say I have papers at home that would say, you said a few things, I don't really recall, I don't remember.

* * *

(DT. 38-41).

Plaintiff did not start receiving social security benefits until 2009 because she "didn't want to apply for it." (DT. 41-42).

Plaintiff was also questioned about the itemized deductions on her 2012 tax return, and, specifically, a deduction for real estate taxes in the amount of eleven thousand nine hundred five dollars ($11,905.00). (DT. 42-43). The following colloquy ensued:

Q.     During that period of time, all during this period of time when you worked for Ben Krupinski you owned a home?

A.     Yes.

Q.     And you lived in that home?

A.     Yes.

Q.     Did there ever come a time where you derived rental income from that home?

[Plaintiff's Counsel]:  Objection, your Honor.

17

THE COURT: Overruled.

[Plaintiff's Counsel]:   The rental of the home has
nothing–

THE COURT: Overruled.

Q.     You derived rental income from the home?

A.     Yes.

Q.     And you rented it for the summer, right?

A.     Yeah, it was the only way to add to my –

THE COURT: The question is when?

Q.     When did you do it?

Did you do it in 2009?

A.     I did it in 2009, yes.

Q.     And did you do it in 2010?

A.     Yes.

Q.     And did you do it in 2011?

A.     Yes.

Q.     And did you do it in 2012?

A.     Yes.

Q.     And during the period of time that you rented the home,
where did you stay?

A.     Well, at one point I was staying in a motel in Montauk and I
would stay there for four nights a week.

In other words, I would stay there Monday night
through Thursday night and pack up the car Friday,
get it all ready, go into work on Fridays.

Then after work I would drive to my son in Queens and then from Queens I would drive back to East Hampton on Monday morning to my position at Mr. Krupinski's.

Q.    And –

A.    And I did that because I needed the money.

Q.    During 2012, did you also derive rental income for the summer?

A.    Yeah.

But it was minuscule because that's when the economy hit, I'm not renting it for any – I'm not renting for any amount of money. It's really coming down in price.

The source of the money is not there. 2010, 2011, 2012, it's just not there.

Q.    How much did you rent it for in 2010?

A.    I'm sorry?

Q.    How much did you rent it for?

A.    When?

Q.    2010.

A.    2010 it would have been, it could have been $25, $30 –

THE COURT: $25 or $30 what?

THE WITNESS:        $25 or $30,000 that helps me offset my mortgage.

THE COURT: I just asked how much.

THE WITNESS:        I'm sorry.

A JUROR:        Is that for the whole summer?

19

THE COURT: For the whole summer?

THE WITNESS:       Yes.

Q.       So in 2010 you rented your home for $25 or $30,000 for the whole summer?

A.       I don't remember the exact amount.

Q.       In 2011 did you rent it again?

[Plaintiff's Counsel]:   Your Honor, again I renew my objection.

THE COURT: Overruled.

[Plaintiff's Counsel]:   The rental income is not –

THE COURT: Overruled.

Q.       In 2011 did you rent it again for the summer?

A.       Yes.

Q.       And how much did you rent it for?

A.       That was the year I was terminated.

I don't remember, I'm sorry. It might be – I don't remember.

I really don't remember.

(DT. 43-47). Defense counsel then questioned plaintiff about where in her 2010 tax return she indicated the rental income that she had received for that summer. (DT. 47). The following colloquy occurred:

A.       I don't know.

I don't even look at this. I don't even look at my tax returns. I give it to my accountant. She does it. I give her the numbers and I have no idea.

20

Q. But you approved the tax return?

A. I'm sorry?

Q. You approved the return?

A. Yes.

Q. It appears that al least the preparer signed it as your return and submitted it as an accurate return.

A. Yes.

Q. In 2011 you said you had similar income, right, from the rental of the home?

A. Yes.

Q. Can you go to Exhibit 14 C and look at line 17.

A. I don't have the exhibit, so you have –

Q. It's the 2011 return.

A. Okay.

I have that in front of me.

Q. Pardon me?

A. I have that in front of me.

Q. Line 21 it says rental of real estate.

A. Line 21 says other income.

This is 2011 that you asked me, correct?

Q. 2011, page one, line 17.

THE COURT: You said 21.

A. Line 17 says $21,027.

Q. Is that the amount of money that you rented the home for?

[Plaintiff's Counsel]:   Objection, your Honor.

These are highly technical questions and it does not take into consideration the depreciation.  We are getting into a very highly technical matter –

THE COURT: Is that your objection?

[Plaintiff's Counsel]:   Yes, your Honor, please.

THE COURT: It's overruled.  Go ahead.

Q.   Is that the amount that you rented it for for that year?

A.   It could be.

I don't remember.

Q.   You don't remember or you don't know?

A.   I don't recall.

Q.   And the line 17 – I'm sorry – Exhibit 14, now we are on 2012.

A.   The tax return for 2012?

Q.   Um-hmm.

A.   Yes, I have it in front of me.

Q.   Line 17.

A.   Yes.

Q.   Says $87,582.

Is that the amount that you rented the home for?

A.   No.

That, I know.

Q.   Do you know what that amount is?

A.    No. It's definitely not the rental. That I know.

Q.    But that year you did rent it?

A.    Yeah, I did.

Q.    And during the time that you rented in 2012, where did you go?

       Where did you live during that time?

A.    Again did the same thing. I would commute and go into my son's, either my son's home or I had a friend that lived also in the Bronx.

Q.    But in 2012 you weren't working, right?

A.    No, no.

       I was looking, but I wasn't working.

Q.    Did you stay there full time?

A.    Well, as a matter of fact I was looking, I was applying for a job in Riverdale while I was there thinking I might find something as a salesperson.

       But, no. I was looking for – I was online. I was putting –

Q.    The question is quite simple.

       Were you living in that residence during the summer of 2012?

A.    Of course.

       [Plaintiff's counsel]: Objection, your Honor, to the extent that where she lives makes no–

       THE COURT: Overruled.

Q.    Now you have confused me. You said of course.

       My question is during the summer of 2012 when you

rented the property were you living there?

A.    Was I living –

Q.    Physically occupying the home?

A.    Sometimes yes because it wasn't rented out for the whole
      year – not the whole year, it wasn't rented out for the whole
      summer.

Q.    So you rented it out for the week?

A.    Sometimes it was two weeks.

      That's when the economy had hit I went renting it
      for, you know huge amounts of money. That's why I
      know $87,000, I don't know what that is, but I know
      there's no way, not even close.

      That wouldn't even be –

Q.    There's no question before you at this point.

A.    Okay.

(DT. 47-51).

Defense counsel also questioned plaintiff about whether she ever "received a thank you for

interviewing, but I'm sorry we can't hire you" letter during her search for employment, (DT. 53),

and the following colloquy ensued:

Q.    Yeah.

A.    Which one was that?

A.    That would be the Douglas Elliman one from Barbara
      Matsen, it's in here someplace.

Q.    That was the only one?

A.    There was another one too.

      I don't know if I have it or she called me.

24

Q.    Well, a call is not the question.

      A written document?

A.    I don't remember.

      I don't know if it's in here or not. I specifically
      remember the Barbara Matsen and Douglas Elliman
      one.

(DT. 53).


### 3.    Redirect Examination

On redirect, plaintiff testified that she rented her house in 2009 and 2010 and, thus, the

rental of her house did not have any relationship to her employment with defendants. (DT. 54). In

addition, plaintiff testified that the "$87,582 number" on her 2012 tax return is a negative number.

(DT. 55).


### 4.    Recross-Examination

On recross-examination, plaintiff testified that her son had put her on as an officer in a bar

that he owned, but she did not make any money from that position. (DT. 55-59). According to

plaintiff, the negative eighty-seven thousand five hundred eighty-two dollar ($-87,582.00) amount

on her 2012 tax return reflected a loss.[10] (DT. 59). When asked if "[t]hat was the only loss of the

whole corporation," plaintiff responded, "I have no idea." (DT. 59).

---

[10] At a sidebar, plaintiff's counsel indicated that her son's corporation "went belly up and
they all received a negative amortization as a capital loss." (T. 58). When asked if plaintiff had
invested in her son's bar, plaintiff's counsel responded: "She was an officer, something to that
effect. I don't know the details." (T. 58).

25

### 5. The Verdict

On September 23, 2013, the jury returned a verdict on the issue of damages: (1) awarding plaintiff damages in the total amount of seven thousand eight hundred forty dollars ($7,840.00) to compensate her for a net loss of wages and benefits to the trial date; and (2) declining to award plaintiff damages to compensate her (a) for future loss of earnings for the period from the date of trial until the date when she would have voluntarily resigned or obtained other employment or (b) for emotional pain and mental anguish. (Fragale Aff., Ex. D). Judgment was entered upon the jury verdicts on September 30, 2013.

## II. Discussion

### A. Standard of Review

Rule 59(a)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that a court "may, on motion, grant a new trial on all or some of the issues–and to any party–as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court * * *[,]" Fed. R. Civ. P. 59(a)(1)(A), "including if the verdict is against the weight of the evidence." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417 (2d Cir. 2012), cert. denied, 133 S. Ct. 789, 184 L. Ed. 2d 582 (2012); see also Lore v. City of Syracuse, 670 F.3d 127, 176-77 (2d Cir. 2012) ("[T]he trial judge enjoys discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence * * *." (quotations, brackets and citation omitted)); DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) ("A new trial may be granted * * * when the jury's verdict is against the weight of the evidence.") "A decision is against the weight of the evidence if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." Raedle, 670 F.3d at 417-18 (quotations,

brackets, ellipsis and citation omitted); see also Carrion v. Agfa Construction, Inc.., 720 F.3d 382, 387 (2d Cir. 2013), cert. denied, 134 S. Ct. 1760, 188 L. Ed. 2d 593 (2014) ("A district court may properly grant a motion for a new trial following a jury verdict when the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." (quotations and citation omitted)); DLC Management, 163 F.3d at 134 ("[T]he court should only grant [a Rule 59] motion when the jury's verdict is 'egregious.'")

On a motion for a new trial pursuant to Rule 59(a)(1)(A), "the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle, 670 F.3d at 418; see also DLC Management, 163 F.3d at 134 ("[A] new trial may be granted even if there is substantial evidence supporting the jury's verdict * * * [and] a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.") Nonetheless, the trial judge "must exercise [his or her] ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility * * * and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." Raedle, 670 F.3d at 418 (quotations and citations omitted). "[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." Id. (quotations and citation omitted). In short, there is a "high degree of deference accorded to the jury's evaluation of witness credibility, and * * * jury verdicts should be disturbed with great infrequency." Id.; see also DLC Management, 163 F.3d at 134 ("[A] court should rarely disturb a jury's evaluation of a witness's credibility.") "[W]here, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously

27

erroneous result, or to prevent a miscarriage of justice." <u>Raedle</u>, 670 F.3d at 418-19.

B.    Back Pay

Plaintiff contends, *inter alia*: (1) that the jury's award of back pay in the amount of only seven thousand eight hundred forty dollars ($7,840.00) is against the weight of the evidence; and (2) that defendants did not submit any evidence (a) indicating that she failed to mitigate her damages, or (b) to offset the amount of back pay due her.  Defendants contend, *inter alia*: (1) that since plaintiff was the only witness to testify at the damages trial, "the only conclusion from the jury's evaluation is that they must not have found Plaintiff's testimony to be credible," (Def. Mem. at 12); (2) that plaintiff "cannot meet the burden to establish the extraordinary circumstances required to [order a new trial][,]" (<u>id.</u>); (3) that "Plaintiff * * * ignores the fact that the jury rightfully determined that she failed to mitigate her damages as she was required to do[,]" (Def. Mem. at 13); and (4) that "[t]hrough cross examination [they] established that Plaintiff had not used diligent efforts to find comparable employment[,]" (Def. Mem. at 14).

"[A] primary purpose of backpay is * * * to return a victim of discrimination to the position she would have found herself in had the violations never occurred * * *." <u>Bergerson v. New York State Office of Mental Health, Central New York Psychiatric Center</u>, 652 F.3d 277, 287 (2d Cir. 2011); <u>see also</u> <u>Saulpaugh v. Monroe Community Hosp.</u>, 4 F.3d 134, 145 (2d Cir. 1993) ("The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination." (quotations and citation omitted)).  "[A]n award of backpay includes 'what the employee himself would have earned had he not been discharged[,]'" <u>Bergerson</u>, 652 F.3d at 287 (quoting <u>Kirsch v. Fleet Street Ltd.</u>, 148 F.3d 149, 166 (2d Cir. 1998)) (brackets in original), and should "therefore consist of lost salary, including anticipated raises, and fringe

benefits[,]" <u>Saulpaugh</u>, 4 F.3d at 145; <u>see also</u> <u>EEOC v. Joint Apprenticeship Committee of the</u> <u>Joint Industryboard of the Electrical Industry ("JAC")</u>, 186 F.3d 110, 124 (2d Cir. 1999) (accord), from the date of the plaintiff's termination until the date of judgment. <u>Id.</u> at 144-45; <u>see also</u> <u>JAC</u>, 186 F.3d at 122 ("An applicant denied employment in violation of Title VII is ordinarily entitled to an award of back pay from the date of the discriminatory action to the date of judgment.")[11]

Nonetheless, "[v]ictims of employment discrimination are required to mitigate their damages[,]" <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 53 (2d Cir. 1998), by "us[ing] reasonable diligence in finding other suitable employment[.]" <u>Id.</u> (quoting <u>Ford Motor Co. v.</u> <u>EEOC</u>, 458 U.S. 219, 231-32 & n. 15, 102 S. Ct. 3057, 73 L. Ed. 2d 721 (1982)); <u>see also</u> <u>Dailey</u> <u>v. Societe Generale</u>, 108 F.3d 451, 455 (2d Cir. 1997) ("[A] prevailing plaintiff in a[n] [employment discrimination] case must attempt to mitigate her damages by using reasonable diligence in finding other suitable employment." (quotations and citation omitted)). "The ultimate question 'is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment.'" <u>Hawkins v. 1115 Legal Service Care</u>, 163 F.3d 684, 695 (2d Cir. 1998) (quoting <u>Pierce v. F.R. Tripler & Co.</u>, 955 F.2d 820, 830 (2d Cir. 1992)). "The question whether an employee has made reasonably diligent efforts is one of fact for the jury." <u>Id.</u> at 696.

"Generally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate." <u>Broadnax v. City of New</u> <u>Haven</u>, 415 F.3d 265, 268 (2d Cir. 2005); <u>see also</u> <u>Dailey</u>, 108 F.3d at 456 ("While it is the plaintiff's duty to mitigate, it is the defendant who has the evidentiary burden of demonstrating at trial that a plaintiff has failed to satisfy this duty.") Although "[t]ypically, the employer has the

---

[11] Plaintiff did not testify or submit any evidence regarding raises or fringe benefits at the damages trial.

burden to demonstrate [(1)] that suitable work existed in the marketplace and [(2)] that its former employee made no reasonable effort to find it[,]" Greenway, 143 F.3d at 53, "[a]n employer * * * is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." Id. at 54; see also Broadnax, 415 F.3d at 268 (accord); Dominic v. Consolidated Edison Co. of New York, Inc., 822 F.2d 1249, 1258 (2d Cir. 1987) ("Had [the defendant] proved that [the plaintiff] failed to mitigate damages * * * [the plaintiff's] back-pay award would have been cut off or reduced at the time of his failure to mitigate * * *.") "The underlying rationale is that an employer should not be saddled by a requirement that it show other suitable employment in fact existed–the threat being that if it does not, the employee will be found to have mitigated his damages–when the employee, who is capable of finding replacement work, failed to pursue employment at all." Greenway, 143 F.3d at 54. The employer "bears the burden [of proof] on the issue of whether the plaintiff made no reasonable efforts to seek alternative employment." Broadnax, 415 F.3d at 270.

In Dailey, the Second Circuit held:

> "[A]n assessment of the reasonableness of a plaintiff's effort to mitigate encompasses more than a simple review of the duration of his or her job search, or of the plaintiff's initial estimates as to how long a successful job search might take; instead, it entails a consideration of such factors as the individual characteristics of the claimant and the job market, * * * as well as the quantity and quality of the particular measures undertaken by the plaintiff to obtain alternate work * * *."

108 F.3d at 456 (quotations and citations omitted).

Defendants satisfied their burden of showing that plaintiff made no reasonable efforts to seek comparable employment after November 2011. Based upon plaintiff's testimony at trial, for the period between the time she returned to work following the surgery on January 3, 2011 and the date of her termination on March 25, 2011, she took nine (9) Thursdays off from work to attend

chemotherapy treatments; six (6) Fridays off from work following her treatments, starting after her fourth treatment; at least two (2) Mondays off from work following her treatments; five (5) days from work because she was sick with the flu; and the entire week of March 21, 2011 off from work following her treatment on March 17, 2011. Thus, of the sixty-five (65) workdays during the period between January 3, 2011 and March 25, 2011, plaintiff did not work for twenty-seven (27), or more than forty percent (40%), of them. Moreover, the amount of time she took off for the treatments got progressively longer, i.e., for the first three (3) treatments, she took only the day of the treatment off; following the fourth treatment, she also called in sick on the Friday following the treatments; then she started calling in sick on the Mondays following the treatment; and her employment was terminated by defendants after she took the Friday, plus the entire next week, off from work following her March 17, 2011 treatment. Thus, the jury could reasonably have found that plaintiff was unable to work at all until after her chemotherapy treatments ended in August 2011. Although plaintiff testified that she would not have continued to take such extensive time off once her anti-nausea medication was changed, the jury was free to reject such self-serving testimony as not credible.

Moreover, although plaintiff testified vaguely on direct examination that she sought comparable employment "from 2011 up until * * * just a couple of weeks" prior to the trial, (DT. 23); attended "about six or seven interviews," but could recall only three (3) of them, (id.); applied for "maybe 40, 50 positions" she found in classified ads and online postings, (DT. 29); and made "[a]t least a hundred, maybe more" job applications since the day she was terminated, (DT. 32), on cross-examination, defense counsel discredited that testimony by, *inter alia*, eliciting the fact that at her deposition in August 2012, when questioned about her "job searching," plaintiff testified only that she "faxed a few things" but received "no calls" and had "no interviews." (DT. 38-41).

31

Moreover, the documents admitted into evidence at trial demonstrate, *inter alia*, that plaintiff made no attempts at all to seek comparable employment until September 2011, after her chemotherapy treatments had ended; that plaintiff made, at most, only three (3) or four (4) attempts to obtain employment in 2011, i.e., between September 14, 2011 and November 2, 2011, and no attempts to obtain employment in 2012; and that the vast majority of plaintiff's attempts at obtaining employment, including at least two (2) of the three (3) interviews about which she testified on direct examination, i.e., with Proper Ph Pools and Douglas Elliman, occurred between January and May 2013, almost two (2) years after her employment had been terminated by defendants and only after she stopped receiving unemployment compensation in or about December 2012.

Thus, it was not seriously erroneous, or a miscarriage of justice, for the jury to find, as it presumably did,: (1) that plaintiff only acted reasonably in attempting to mitigate her damages by seeking comparable employment for an approximate eight (8)-week period, i.e., from September 14, 2011 to November 2, 2011; and (2) that plaintiff did not act reasonably in attempting to mitigate her damages by failing to pursue any employment at all for approximately fourteen (14) months thereafter, i.e., from November 3, 2011 to early January 2013, or until after she stopped receiving unemployment compensation. Since plaintiff testified that she earned twenty-four dollars and fifty cents ($24.50) an hour at the time that her employment was terminated, (DT. 9), or nine hundred eighty dollars ($980.00) a week, the jury's award of seven thousand eight hundred forty dollars ($7,840.00) (nine hundred eighty dollars [$980.00] for eight [8] weeks) was not against the weight of the evidence.[12] Accordingly, the branch of plaintiff's motion seeking a new trial on the issue of back pay is denied.

---

[12] In light of this determination, the parties' remaining contentions with respect to the jury's back pay award will not be considered.

## C.     Front Pay

Plaintiff contends, *inter alia*, that the jury's failure to award her any amount of front pay was seriously erroneous because, at trial, she "presented credible and compelling evidence that she is able to and needs to work for the foreseeable future and that she has endeavored to find comparable employment, but has been unable to secure any." (Plf. Mem. at 21). Defendants contend, *inter alia*: (1) that "the jury properly declined to award front pay since Plaintiff did not mitigate her damages," (Def. Mem. at 19); and (2) that "[i]t would be pure speculation for the jury to guess how long [plaintiff] would have continued to work," (id.)

"[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." Pollard v. E.I. du Pont de Nemours and Co., 532 U.S. 843, 846, 121 S. Ct. 1946, 150 L. Ed. 2d 62 (2001). "The purpose of front pay is to 'mak[e] victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment.'" Bergerson, 652 F.3d at 286 (quoting Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 125-26 (2d Cir. 1996)); see also Sagendorf-Teal v. County of Rensselear, 100 F.3d 270, 277 (2d Cir. 1996) (accord); Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1182 (2d Cir. 1996) (accord).

As with an award of back pay, a plaintiff seeking an award of front pay "has the duty to exercise reasonable diligence in mitigating damages by seeking alternative employment." Reed, 95 F.3d at 1182; see also Padilla, 92 F.3d at 125 (holding that a plaintiff claiming employment discrimination and seeking an award of front pay has the duty to mitigate damages by "us[ing] reasonable diligence in finding other suitable employment." (quotations and emphasis omitted)). A "failure to mitigate deprives [the plaintiff] of any entitlement to receive an award for front pay * * *." Greenway, 143 F.3d at 55; see also Dominic, 822 F.2d at 1258 ("Had [the defendant] proved

33

that [the plaintiff] failed to mitigate damages * * * any front-pay award would have been foreclosed.")

Moreover, front pay is properly denied if "the proposed methods for calculating the award [are] too speculative." Sagendorf-Teal, 100 F.3d at 277; see also Dunlap-McCuller v. Riese Organization, 980 F.2d 153, 159 ("[A]n award of front pay cannot be unduly speculative.")

Since, as set forth above, the jury could reasonably have found that plaintiff failed to mitigate her damages after November 2, 2011, its failure to award her any amount of front pay was not seriously erroneous or a miscarriage of justice. In any event, any award of front pay would have been unduly speculative since, *inter alia*, plaintiff, who was seventy (70) years old at the time of trial, testified only that she expected to work "as long as [she] could, five, six, seven, ten years." (DT. 25). See, e.g. Hine v. Mineta, 238 F. Supp. 2d 497, 502 (E.D.N.Y. 2003) (finding that an award of front pay would be unduly speculative where, *inter alia*, "[t]he plaintiff presented no evidence on the average work expectancy of an air traffic controller * * * [or] how long she expected to work in th[at] profession.") Moreover, the jury was free to reject plaintiff's testimony that she needed to work for financial reasons and would continue to look for work because "there's no way [she] could live on [her] social security and [her] pension," (DT. 33-34), particularly in light of her vague and seemingly evasive responses on cross-examination regarding the rental income she received from renting out her house in the Hamptons for the summer. Accordingly, the branch of plaintiff's motion seeking a new trial on the issue of front pay is denied.


D.      Compensatory Damages for Emotional Distress

Plaintiff contends, *inter alia*: (1) that the jury's failure to award her compensatory damages for her emotional distress "is outright unconscionable," (Plf. Mem. at 24), because (a) she

"presented uncontroverted testimony that she suffered emotionally from Defendants actions[,]" (id. at 22), (b) the "stress of losing her job is now compounded by the imminent foreclosure proceeding[,]" (id. at 23), and (c) "the combination of her medical problems with her job termination with its consequent adversities can only exacerbate one's stress and anxiety level[,]" (id.); and (2) that verdicts in similar cases necessitate a new trial, (id. at 24). Defendants contend, *inter alia*, (1) that "Plaintiff's failure to corroborate her subjective claims of emotional harm provided ample reason for the jury to award her nothing [for her emotional distress claim][,]" (Def. Mem. at 21); and (2) that "even assuming that subjective claims of emotional harm would be sufficient for a jury to award a nominal amount of damages, the jury was free to reject [plaintiff's] testimony[,]" (id.)

At trial, plaintiff testified that she was "shocked" and "very upset" following defendants' termination of her employment, (DT. 8); that she was "embarrass[ed]" that she was unable to pay her bills, (DT. 33-34); and that she got "depressed" and "scared" following her receipt of the Capital One letter. (DT. 36). When asked if she sought any medical treatment for her depression, plaintiff responded: "No, no. It's just that, you know, you go into that little hole, you know, you go into that little hole every so often and you feel sorry for yourself and then you come out of it and you try to do what you need to do to help yourself." (DT. 37).

"[A] plaintiff must introduce evidence of actual mental or emotional injury in order to recover compensatory damages." McIntosh v. Irving Trust Co., 887 F. Supp. 662, 665 (S.D.N.Y. 1995); see also Levitant v. City of New York Human Resources Administration, 914 F. Supp. 2d 281, 309 (E.D.N.Y. 2012), aff'd, 558 F. App'x 26 (2d Cir. Mar. 6, 2014) ("To obtain emotional distress damages, a plaintiff must establish actual injury and the award must be supported by competent evidence in addition to a plaintiff's subjective testimony." (quoting Olsen v. County of

35

Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009))); United States v. Vulcan Society, Inc., 897 F.

Supp. 2d 30, 44 (E.D.N.Y. 2012) (holding that under either federal or New York State law,

"claimants must show that they have suffered actual emotional injury based on proof of concrete

emotional problems."); Cullen v. Nassau County Civil Service Commission, 53 N.Y.2d 492, 497,

442 N.Y.S.2d 470, 425 N.E.2d 858 (N.Y. 1981) ("The record must contain proof that the

complainant in fact suffered mental anguish or humiliation, * * * which may be established

through the testimony of the complainant alone * * *." (citations omitted)). "[V]ictims of

intentional employment discrimination may recover compensatory damages * * * if they prove that

the discrimination caused them emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, or other nonpecuniary losses." United States v. City of New York, 276 F.R.D.

22, 37 (E.D.N.Y. 2011) (quotations, brackets and citations omitted).

    Even assuming, without deciding, "that there is a requirement under federal law that

plaintiffs demonstrate some physical manifestation of their emotional suffering, New York

seemingly imposes a less stringent standard." Hill v. Airborne Freight Corp., 212 F. Supp. 2d 59,

72 (E.D.N.Y. 2002), aff'd, 93 F. App'x 260 (2d Cir. Feb. 18, 2004). "[T]he [New York] Court of

Appeals has held that compensable emotional injury may be proved by plaintiff's own

testimony[,]" Green v. City of New York, 359 F. App'x 197, 201 n. 2 (2d Cir. Dec. 30, 2009)

(citing New York City Transit Authority v. State Division of Human Rights ("NYCTA"), 78

N.Y.2d 207, 216, 573 N.Y.S.2d 49, 577 N.E.2d 40 (1991)), and that "psychiatric or other medical

treatment is not a precondition to recovery [under the NYHRL]." NYCTA, 78 N.Y.2d at 216, 573

N.Y.S.2d 49. Thus, for claims under the NYHRL, "[m]ental injury may be proved by the

complainant's own testimony, corroborated by reference to the circumstances of the alleged

misconduct." Id.

Nonetheless, "[b]eyond the fact of mental anguish caused by discriminatory conduct, there must be some evidence of the magnitude of the injury, to assure that the * * * damage award is neither punitive nor arbitrary." NYCTA, 78 N.Y.2d at 217, 573 N.Y.S.2d 49; see also McIntosh, 887 F. Supp. at 666 ("A plaintiff's recovery of damages for mental anguish under the [NYHRL] is limited to compensation for actual and proven injury and while proof of mental anguish or emotional distress does not have to include medical testimony and it may consist of the plaintiff's testimony, alone, as corroborated by reference to the circumstances of the alleged misconduct, * * * the plaintiff did not present proof to the jury that could justify the jury's award."); Cullen, 53 N.Y.2d at 497-98, 442 N.Y.S.2d 470 (holding that compensatory damages may not be awarded "solely upon a finding that a discriminatory act occurred for that would be punitive.")

Although the jury could have awarded plaintiff compensatory damages for emotional distress based upon her testimony alone if it found such testimony credible, it was also entitled to make no award of compensatory damages if it believed, which it presumably did, that plaintiff's sparse testimony regarding her emotional distress was not credible and, thus, that plaintiff had not proven actual damages as a result of defendants' discriminatory termination of her employment. Carrion, 720 F.3d at 387 (holding that "the District Court did not err, let alone 'abuse its discretion,' in denying [the plaintiff's] motion for a new trial as to [compensatory] damages" because "the jury could have reasonably concluded that [the plaintiff] had not proven actual damages as a result of [the defendant's] discriminatory conduct.") Since, *inter alia*, the record is bereft of any evidence of the magnitude or duration of the purported emotional distress plaintiff sustained as a result of defendants' discriminatory termination of her employment, and plaintiff did not testify or proffer any evidence, *inter alia*, that her life activities were curtailed in any way as a result of any mental injury, the jury's failure to award plaintiff any amount of compensatory

37

damages for emotional pain and mental anguish was not seriously erroneous or a miscarriage of justice. See, e.g. McIntosh, 887 F. Supp. at 664-65 ("Because the plaintiff introduced such sparse evidence with respect to the magnitude and duration of any emotional injury or mental distress that he sustained [*e.g.*, he did not testify in any detail with respect to the magnitude or the duration of any mental distress or that his life activities were curtailed in any way and there was no evidence that he sought any medical or psychological help except for one visit to a doctor while he was still employed], the jury was forced to speculate in awarding him compensatory damages. It is precisely this kind of speculation that is insufficient to support a jury award * * *."); Ware v. ABB Air Preheater, Inc., No. 91-cv-37S, 1995 WL 574464, at * 7 (W.D.N.Y. Sept. 28, 1995) (holding that the plaintiff was not entitled to a new trial on the issue of compensatory damages for emotional distress because, "[w]hile the jury was entitled to make an award of compensatory damages for mental distress based on [the plaintiff's testimony that he 'felt terrible' and 'lost the will to function in his normal capacity'], it was not required to do so.") Accordingly, the branch of plaintiff's motion seeking a new trial on the issue of compensatory damages for emotional pain and mental anguish is denied.

III.    Conclusion

For the reasons stated herein, plaintiff's motion for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure is denied in its entirety.

SO ORDERED.

s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: July 14, 2014
       Central Islip, N.Y.

38